**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| **Plaintiff**, | ) ) ) |
| vs. | ) Case No. 13-CR-10 JED ) |
| **CHRISTOPHER WHITE,** | ) ) |
| **Defendant**. | ) |

## OPINION AND ORDER

The Court has for its consideration defendant Christopher White's Motion to Suppress Pre-Trial Identification (Doc. 34) (the "Motion"). The United States has filed a response (Doc. 35), and on April 11, 2013, the Court held an evidentiary hearing on the Motion.

### I.

On August 17, 2012 two Kum & Go stores in Tulsa, Oklahoma, were robbed by three suspects. Julien Hale pled guilty to the robberies and and Kaleb Meyers was convicted for his role in the robberies. White is charged in this case as the remaining suspect in the robberies.

The second robbery of August 17 involved 18 year old Taylor Murphy, a woman who was working the register at the time the suspects entered the Kum & Go. This robbery lasted approximately three (3) minutes. During that time, Ms. Murphy was taken to a back store room by Kaleb Meyers and "suspect two," alleged in this case to be Mr. White. During Ms. Murphy's time in the back store room, she was guarded by suspect two for approximately 35 seconds while the others went about their robbery of the store. Suspect two's face was mostly covered by his shirt, which was pulled up over most of his face, and a head covering of some type, which was pulled down over his forehead. According to the government, Ms. Murphy was able to see

suspect two's "eyes, the bridge his nose, and his complexion." (Doc. 35, at 2). Ms. Murphy was face-to-face with suspect two for the duration of her time in the back room.

On November 30, 2012 – 105 days after the robbery – Ms. Murphy was interviewed by Special Agent Charles Jones of the Federal Bureau of Investigation.[1] Near the end of her interview, Ms. Murphy mentioned to Special Agent Jones that she would be able to point out suspect two if she had the opportunity to see him again. Upon realizing that Ms. Murphy had not yet viewed a photo lineup which included the defendant, who was suspected of the crime at that time, Special Agent Jones printed a copy of a photo lineup created by the Tulsa Police Department. This photo lineup included Mr. White among the six-person array.[2] According to Special Agent Jones, when Ms. Murphy was presented with the array, she promptly used her hands to cover the four outermost photos in the lineup and then identified Mr. White, whose image was in the center of the bottom row, as the individual who had been in the back room with her.

Defendant seeks to suppress Ms. Murphy's out-of-court identification of Mr. White on the basis that the photo array shown to Ms. Murphy was impermissibly suggestive.

**II.**

In order to prevail on his argument that Ms. Murphy's out-of-court identification should be suppressed, defendant must demonstrate that the identification procedure – specifically the

---

[1] Special Agent Charles Jones testified at the April 11, 2013 hearing. The parties represented that Ms. Murphy was unavailable as a witness. Neither party sought a continuance based upon Ms. Murphy's absence, and the Court is satisfied that it can reach its decision in the absence of her testimony.

[2] According to Special Agent Jones, the November 30, 2012 interview between he and Ms. Murphy took place over three months after the robberies because there was a significant investigation performed by the FBI prior to determining that it would exercise federal jurisdiction over the matter.

photo array – was impermissibly suggestive. *Simmons v. United States*, 390 U.S. 377, 384 (1968). When the constitutionality of a photo array is challenged, as here, a two-pronged due process inquiry is mandated: "first, the court must determine whether the photo array was impermissibly suggestive, and if it is found to be so, then the court must decide whether the identifications were nevertheless reliable in view of the totality of the circumstances." *United States v. Sanchez*, 24 F.3d 1259, 1261-62 (10th Cir. 1994) (citing *Simmons*, 390 U.S. at 384 (1968). These two prongs are analyzed separately and the second prong is only analyzed if the array is found to be impermissibly suggestive. *Sanchez,* 24 F.3d at 1262.

Under the first *Simmons* prong, the Court looks at "the size of the array, the manner of its presentation by the officers, and the details of the photographs themselves." *Id*. The number of photos in the array is not considered a dispositive factor and is instead used as a guidepost for analyzing the other two factors. *Id*. at 1263. "The lower the number of photographs used by officers in a photo array, the closer the array must be scrutinized for suggestive irregularities." *Id*. The Tenth Circuit has noted that arrays with only six photos warrant close scrutiny. *See id*.; *see also United States v. Wiseman*, 172 F.3d 1196, 1209-10 (10th Cir. 1999).

**III.**

Defendant criticizes the photo array used during Ms. Murphy's identification of him for three reasons. First, defendant argues that the individuals depicted do not look alike and, of the six indivduals shown, only one of the other five has skin as dark as his. Second, defendant states that the background of the only other dark individual is different in color from his. Third, defendant argues that Julien Hale, who identified White as one of the robbers in connection with his arrest, was shown a different photo array which was, according to defendant, "much closer to an appropriate photo array." (Doc. 34, at 3). Defendant also points out that witness

3

misidentification is a significant cause of wrongful conviction and many of the factors which result in misidentification are present in this case.[3]

The Court finds that the photo array at issue here, while only containing six photos, is not impermissibly suggestive. The differences noted by defendant are not significant enough to warrant suppression of Ms. Murphy's out-of-court identification. The defendant is correct that, of the six individuals in the array, White is on the darker end of the skin-tone spectrum. One individual appears to be as dark as White and one other has only slightly lighter skin tone. (*See* Docs. 34-2; 35-1). The remaining three individuals depicted have lighter skin tone. These minor variations are not enough to render the array impermissibly suggestive, as they do not cause Mr. White to "jump out" at the person viewing the array as the culprit. *Sanchez*, 24 F.3d at 1262-63 (holding that array was not impermissibly suggestive where defendant was the only of six indivduals depicted with his eyes closed, but array was presented to witness without comment as to the details); *U.S. v. Knight*, 382 F. App'x 905 (11th Cir. 2010) (holding that six-photo array was not impermissibly suggestive despite the fact that defendant had lighter complexion than four others and background lighting in his photo was slightly different from others); *U.S. v. Jones*, 652 F. Supp. 1561 (S.D.N.Y. 1986) (holding that six-photo array was constitutional where defendant's skin was lighter than others but similar to one other's skin tone and despite the fact that defendant was the only person whose face was pock-marked).

The two other issues raised by defendant are likewise insufficient to render the array impermissibly suggestive. First, the fact that the background is different on the photo of the other individual whose skin tone is similar to White's ("suspect number one" in the lineup) is not

---

[3] While the Court is highly cognizant of the perils of witness misidentification, the factors cited by defendant on page 3 of his Motion are more properly the subject of cross examination of the identifying witness at trial.

of assistance to Mr. White. If anything, this difference makes *that* individual's picture stand out more to a viewer than White's because it could appear to have been taken under different circumstances than the remaining photos. *See Sanchez*, 24 F.3d at 1262-63. In *Sanchez*, the Tenth Circuit explained the effect of having a variation in a single picture within a lineup:

> Upon continued inspection, the witness may begin to believe that the "oddball" picture was taken under different circumstances than the others. This fact can suggest a number of things to the witness, the most dangerous of which is that the similar pictures were taken together to form a pool or control group, and that the one picture that stands out is the suspect.

*Id*. The concern raised by the *Sanchez* court is not present in Mr. White's picture, but is arguably present in suspect number one's photo, thereby potentially drawing attention *away* from Mr. White. Second, the fact that a second array existed, which arguably contained images of indivduals whose skin tone more closely matched Mr. White's, does not alter the analysis of the array shown to Ms. Murphy. Special Agent Jones testified at the April 11 hearing that the second array (Doc. 34-3) was not shown to Ms. Murphy because the array at issue (Doc. 34-2) was the only version he had electronically available to print at the time of her November 30, 2012 interview.

Based upon the above analysis of the photo array presented to Ms. Murphy, the array's size and the details of the photos contained therein, as well as the neutral manner in which the array was presented, the Court holds that the array was not impermissibly suggestive. Having so held, the Court need not reach the analysis required by the second prong of the *Simmons* test.

**IT IS THEREFORE ORDERED** that defendant's motion to suppress (Doc. 34) is **denied**.

**SO ORDERED** this 12th day of April, 2013.

JOHN E. DOWDELL
UNITED STATES DISTRICT JUDGE

5